[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12071

_____

M.H.,
a minor child, by and through his mother
and legal guardian,
THELMA LYNAH,
C.C.,
a minor child, by and through her mother
and legal guardian, Christine Claxton,
H.K.,
a minor child, by and through her mother
and legal guardian, RUTH KITT,
E.C.,
a minor child, by and through her mother
and legal guardian, Ketie Calixte,

                                        Plaintiffs-Appellees,

S.R. et al.,

2                     Opinion of the Court                    22-12071

                                                                    Plaintiffs,

*versus*

COMMISSIONER OF THE GEORGIA DEPARTMENT OF
COMMUNITY HEALTH,

                                                      Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:15-cv-01427-TWT

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER,
Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This interlocutory appeal requires us to decide whether the
provision of skilled nursing for severely disabled children by the
Georgia Department of Community Health complies with the
Medicaid Act. When the Department reviews the request of a dis-
abled child's treating physician for skilled nursing, a contractor rec-
ords the patient's conditions on a scoresheet to arrive at a presump-
tive range of skilled-nursing hours that the patient should receive
each week. The Department periodically reduces those hours as
the patient's caregiver learns to perform skilled tasks. This class

action challenges those practices. The district court granted summary judgment for the patients and entered several permanent injunctions against the Commissioner of the Department. But we conclude that both the contractor's use of the scoresheet and the practice of reducing the hours of skilled nursing as a patient's caregiver learns to perform skilled tasks comply with the Medicaid Act. We reverse in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

We explain the background of this appeal in three parts. First, we explain the provisions of the Medicaid Act about services for eligible patients under 21 years old. Second, we explain how the Department provides services through its pediatric program. Third, we explain this lawsuit.

### A. Medicaid Coverage of Early and Periodic Screening, Diagnostic, and Treatment Services

The Medicaid Act, 42 U.S.C. §§ 1396–1396w-8, establishes a "jointly financed federal-state cooperative program, designed to help states furnish medical treatment to their needy citizens." *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011). Under the Act, states "devise and fund their own medical assistance programs," and the "federal government provides partial reimbursement." *Id.* States choose whether to participate in Medicaid. *Id.* But if they participate, they must comply with "federal statutory and regulatory requirements." *Id.* The Department of Health and Human Services implements the Act through regulations. *Id.*

The Medicaid Act provides that a "'State plan for medical assistance' must meet various guidelines, including the provision of certain categories of care and services." *Id.* (quoting 42 U.S.C. § 1396a). The provision of some services is mandatory, and the provision of other services is discretionary. *Id.* Even if the Act mandates that a state provide a certain kind of "medical services or treatments," the state must provide those "medical services or treatments . . . only if they are 'medically necessary.'" *Id.* at 1233. Although the Medicaid Act does not use the phrase "medical necessity," that standard is a "judicially accepted component of the federal legislative scheme." *Id.* at 1232.

Congress amended the Medicaid Act in 1989 to "broaden the categories of services that participating states must provide to Medicaid-eligible children." *Id.* at 1233. The 1989 Amendment requires participating states to provide early and periodic screening, diagnostic, and treatment services to "all Medicaid-eligible persons under the age of 21." *Id.* (citing 42 U.S.C. § 1396d(a)(4)(B), (r)). This requirement provides "low-income children with comprehensive health care." *Id.* "Early and periodic screening, diagnostic, and treatment services" include screening services, vision services, dental services, hearing services, and "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) [of section 1396d] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(1)–(5). Among the other

measures described in subsection (a) and covered by this provision are "private duty nursing services." *Id.* § 1396d(a)(8).

### B. *The Georgia Pediatric Program*

The Georgia Department of Community Health administers the state Medicaid program. It provides private nursing services for "medically fragile children who qualify for Medicaid" through the Department's pediatric program. Skilled-nursing services for program participants include tasks such as assessing the placement and efficacy of a gastrostomy tube, feeding a patient through a gastrostomy tube, assessing the efficacy of a tracheostomy, administering oxygen via a ventilator and otherwise, intravenous therapy, deep suctioning, determining the need for as-needed medications, and performing assessments.

The Department contracts with Alliant Health Solutions, a private consulting organization, to review requests for in-home skilled nursing for patients to determine the number of skilled-nursing hours a patient should receive. A nursing agency, with approval from a patient's treating physician, requests skilled-nursing services to enroll the patient in the pediatric program. A patient who is accepted into the program is approved for a certain number of skilled-nursing hours a week. Alliant periodically reviews each participating patient's case to determine the medically necessary number of skilled-nursing hours. The nursing agency or the patient's physician can also submit a request to change the number of approved hours at any time.

The Department requires documents to support an initial request for skilled-nursing care, a change request, or a periodic review. These documents include hospital records and discharge summaries, nursing notes, an individual education plan, a caregiver checklist that details a caregiver's ability to perform certain tasks, and a statement of medical necessity signed by the nursing agency and treating physician. The statement of medical necessity outlines the patient's diagnoses and conditions and the needed treatments and medications to support the skilled-nursing hours that the patient's physician requests.

Alliant's review process has two steps. First, a nurse on a medical-review team completes a scoresheet that Alliant developed and that the Department approved. Before the review team meets, a team nurse completes the scoresheet and checks boxes for each medical condition of the patient and each medical device the patient uses. The scoresheet uses a system of points, which results in a presumptive range of skilled-nursing hours that a patient should receive. For example, a patient with between 13 and 18 points has a presumptive range of between 42 and 84 skilled-nursing hours a week. A developer of the scoresheet testified that it is designed to ensure that the review team considers "every single organ system" of a patient.

Second, the medical-review team meets and discusses how many skilled-nursing hours a patient should receive based on the presumptive range. The team has one physician and at least two nurses, one of whom completed the scoresheet. At the meeting,

the team considers the number of hours within the presumptive range for each patient. The nurse who completed the scoresheet discusses the patient's score, any change in score from a previous review, any intervening events that might warrant a change in nursing hours, the patient's current level of care, and whether the treating physician and nursing services provider explained a request for more hours. The discussion is brief: the team spends about two to three minutes on a patient and reviews 25 patients an hour. The team doctor does not see a patient's records. Only the nurse who completes the scoresheet reviews the records of the treating physician.

The Department also has a practice in which it initially approves additional hours for a patient and then reduces those additional hours periodically as the patient's caregiver learns to perform skilled tasks and care for the patient. The Department considers the caregiver's need to learn skilled-nursing tasks when it decides how many hours to approve. As a caregiver learns to perform skilled tasks, the department periodically reduces the number of skilled-nursing hours it approves. Alliant's former medical director explained that the periodic reductions account for the possibility that a patient "could be adequately cared for with a lesser number" of skilled-nursing hours. Alliant refers to reducing a patient's hours as "weaning" the patient. The Department weans patients to avoid an abrupt change in their skilled-nursing care.

### C. This Lawsuit

In 2015, M.H. and another minor child, through their legal guardians, filed a putative class action against the Commissioner of the Department. *See* 42 U.S.C. § 1983. The complaint sought certification of a class of "all Medicaid-eligible individuals under the age of 21 who are now, or will in the future be, [participants] in the [Georgia pediatric program] and are subjected to the policies and practices of [the Department]." The complaint alleged that the Department violated the "early and periodic screening, diagnostic, and treatment" provision of the Medicaid Act, *id.* § 1396d(r), because the Department failed to approve the number of skilled-nursing hours that were medically necessary to care for the patients. The district court later consolidated three similar complaints filed by the guardians of C.C., H.K., and E.C., three other minor children, with this action. The minor child with whom M.H. filed the original complaint settled with the Department in 2016, and the district court dismissed that patient's claims with prejudice.

Later, M.H. obtained a preliminary injunction preventing the Department from approving fewer than 18 hours a day of skilled-nursing care for him. The district court also granted temporary restraining orders or preliminary injunctions relating to the number of skilled-nursing hours that the Department could approve for C.C., H.K., and E.C., as well as several other putative class members. In each ruling, the district court ordered the Department to provide the skilled-nursing hours recommended by a patient's

treating physician instead of the lower hours approved by the Department.

The district court granted M.H.'s motion for class certification under Federal Rule of Civil Procedure 23(b)(2) in 2017. The district court determined that the action presents three issues of law or fact common to the class: (1) whether the Department gives the recommendation of a patient's treating doctor appropriate weight; (2) whether the Department unlawfully assumes that a patient's caregiver can learn skilled-nursing techniques, an assumption that allows the Department to wean a patient off the program; and (3) whether the Department allegedly fails to consider the capacity of a primary caregiver when determining the number of medically necessary skilled-nursing hours. *See* FED. R. CIV. P. 23(a). The Commissioner petitioned this Court for permission to appeal the order granting class certification under Rule 23(f), but we denied the petition.

After the parties filed cross-motions for summary judgment, the district court granted summary judgment for the patients. First, the district court ruled that the Department failed to give the recommendation of a patient's treating physician the appropriate weight when determining the number of skilled-nursing hours that were medically necessary for the patient. Second, the district court ruled that the Department improperly imposed a "teach and wean" policy in which caregivers are taught skilled-nursing tasks and the patient is then weaned from skilled-nursing hours previously considered medically necessary. The district court explained

that the Medicaid Act "requires private duty nursing services [to] be provided by licensed nurses" and "does not provide for the delegation of activities which require the knowledge and skill of a licensed nurse." Third, the district court ruled moot the issue of the alleged failure to consider the caretaking capacity of a patient's caregiver.

After the grant of summary judgment, named plaintiffs M.H., C.C., and E.C., and class members K.M., R.V., B.P., N.H., and E.P., sought permanent injunctions to prevent the department from approving fewer than the number of skilled-nursing hours that their physicians prescribed for them. The district court entered separate permanent injunctions for the eight patients for whom it had granted preliminary injunctions.

Following the issuance of the permanent injunctions, the Commissioner filed this appeal, which we dismissed in part. We ruled that we lack final-order jurisdiction over the appeal because the district court had not ruled on classwide relief. *See* 28 U.S.C. § 1291. But we ruled that we have jurisdiction to review the permanent injunctions. *See id.* § 1292(a)(1). And we have pendent jurisdiction over the summary judgment and preliminary injunctions because the permanent injunctions are based on them. *See Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016) (We have pendent appellate jurisdiction over otherwise nonappealable issues that are "'inextricably intertwined'" with an appealable issue or that are "'necessary to ensure meaningful review'" of an appealable issue. (quoting *Jackson v. Humphrey*, 776 F.3d 1232, 1239 (11th Cir. 2015)).

We dismissed the appeal of the class-certification order because it is not inextricably intertwined with the permanent injunctions.

## II. STANDARDS OF REVIEW

We review a summary judgment *de novo*. *Thai Meditation Ass'n of Ala. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Summary judgment is proper when, construing all facts in the non-movant's favor, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* We also interpret statutes *de novo*. *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1343 (11th Cir. 2008). And we review our jurisdiction *de novo*. *Thomas v. Phoebe Putney Health Sys., Inc.*, 972 F.3d 1195, 1200 (11th Cir. 2020). We review for abuse of discretion the issuance of an injunction. *Wilshire*, 531 F.3d at 1343; *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1288 (11th Cir. 2022).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that the district court erred by granting summary judgment for the patients on their challenge to the sufficiency of the review process and issuing permanent injunctions requiring the Department to approve the skilled-nursing hours prescribed by the patients' treating physicians. Second, we explain that the district court erred by granting summary judgment for the patients on their challenge to the practice of reducing the skilled-nursing hours of patients whose caregivers have learned to perform skilled tasks and by permanently enjoining that practice. Third, we explain why our pendent jurisdiction does not permit review of the patients' challenge to the

alleged lack of consideration of caregiver capacity. Fourth, we explain that the appeal of the preliminary injunctions is moot.

### A. *The Review Process Satisfies the Medicaid Act.*

The Commissioner argues that the district court erred when it granted summary judgment for the patients on their challenge to the review process and issued permanent injunctions requiring the Department to approve the skilled-nursing hours prescribed by the patients' treating physicians. He argues that our precedent does not require the Department to defer to the patients' treating physicians' recommendations. The patients respond that the review process unlawfully minimizes the recommendation of their treating physicians in violation of the Medicaid Act. We conclude that the review process satisfies the Act.

There is no genuine issue of material fact relating to the consideration of treating physicians' recommendations. The parties agree that the Department considers a treating physicians' recommendation. They disagree about whether the Department sufficiently considers that recommendation.

The Act requires the Department to provide private nursing services to the patients only if the services are medically necessary. *See Moore*, 637 F.3d at 1234. The Act guarantees eligible persons under the age of 21 private nursing services to "correct or ameliorate" defects, illnesses, and conditions that the required screening services detect. 42 U.S.C. § 1396d(a)(4)(B), (a)(8), (r). The services must be "sufficient in amount, duration, and scope to reasonably achieve [their] purpose." 42 C.F.R. § 440.230(b). But a state "may

place appropriate limits on a service based on such criteria as medical necessity." *Id.* § 440.230(d). We have interpreted these provisions to require that states "provide private duty nursing services" to patients who qualify if "such services are medically necessary to correct or ameliorate [a patient's] illness and condition." *Moore*, 637 F.3d at 1255.

The Act and its implementing regulations permit states to set "reasonable standards for the terms 'necessary' and 'medical necessity.'" *Garrido v. Dudek*, 731 F.3d 1152, 1154 (11th Cir. 2013) (first citing 42 U.S.C. § 1396a(a)(17); and then citing 42 C.F.R. § 440.230(d)). The Supreme Court has interpreted section 1396a(a)(17) to confer "broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives of' the Act." *Beal v. Doe*, 432 U.S. 438, 444 (1977). And treating physicians must "operate within such reasonable limitations as the state may impose." *Rush v. Parham*, 625 F.2d 1150, 1156 (5th Cir. 1980).

A patient's treating physician is a "key figure and initially determines what amount of nursing services are medically necessary." *Moore*, 637 F.3d at 1257. But a state "may still review the medical necessity of the amount of nursing care prescribed by the treating physician and make its own determination of medical necessity." *Id.* The provision of private nursing services must be "sufficient in amount, duration, and scope to reasonably achieve its

purpose," that is, to "correct or ameliorate" a patient's condition. *Id.* at 1257–58.

A state's consideration of a treating physician's recommendation is sufficient if the state evaluates the "medical necessity of the amount of nursing care prescribed by the treating physician" for the patient's condition or conditions, even if the state does not defer to the treating physician's prescription. *See id.* at 1227–28, 1257–58. In *Moore*, we evaluated both the number of hours that were medically necessary for a patient and "who" must make that determination. *Id.* at 1257. We ruled that although a treating physician has the "primary responsibility of determining what treatment should be made available to" a patient, the state "may still review the medical necessity of the amount of nursing care prescribed . . . and make its own determination." *Id.* (citation and internal quotation marks omitted). And we concluded that the review process in *Moore* satisfied the Act because the review team evaluated the orders of the patient's treating physician. *Id.* The team considered the medical necessity of the treatment that the patient's treating physician prescribed, and it concluded that a reduction in skilled-nursing hours would not affect the patient's condition. *Id.* at 1227–28. We ruled that, "[a]fter that review, the state may limit required private duty nursing services based upon a medical expert's opinion of medical necessity so long as . . . the services provided are sufficient in amount and duration to reasonably achieve the purpose of private duty nursing services." *Id.* at 1257. Because the state considered the medical necessity of the treatment that the treating physician prescribed, the "pivotal issue" was

whether it approved enough hours to treat the patient's conditions. *Id.* at 1257–58. We rejected the argument that either the treating physician or the state's medical expert "must have complete control" or "be deferred to." *Id.* at 1259–60. Instead, we held that if a state evaluates the medical necessity of the treatment that a patient's treating physician prescribed, the only question is whether the state approved sufficient services to correct or ameliorate the patient's conditions. *See id.* at 1257–60.

The Department evaluates the medical necessity of the treatment that the patient's treating physician recommends and then approves a number of skilled-nursing hours to correct or ameliorate the patient's conditions. The review process that Alliant conducts on behalf of the Department satisfies the standard for considering a treating physician's recommendation. *See id.* The Alliant scoresheet converts the patient's conditions into a presumptive range of medically necessary skilled-nursing hours that the review team then discusses.

The patients acknowledge that the scoresheet accounts for a patient's "specific conditions and skilled care needs." They argue that the review team's focus on the scoresheet during its discussion diminishes its focus on the treating physician's recommendation. But our precedent does not require the Department to defer to the recommendation of the treating physician. *Id.* at 1259–60.

The Department need only evaluate a patient's recommended treatment and decide the hours medically necessary to treat the patient's conditions. *Id.* at 1257. As was true in *Moore,*

where the state reviewed the skilled-nursing hours needed to treat the patient's condition, *id.* at 1227–28, the Department accounts for the skilled-nursing needs for specific conditions. It streamlines that process by using a scoresheet. The Medicaid Act, its implementing regulations, and *Moore* do not require a different form of review. *See id.* at 1257–60.

When the Department evaluates a treating physician's recommendation, the question becomes whether the Department approved sufficient hours to reasonably correct or ameliorate those conditions. *Id.* at 1257–58. Although individual patients might argue that the number of approved hours that they receive does not satisfy this standard, that question is not before us. The only issue before us is the sufficiency of the review process. And that process satisfies the Medicaid Act. The district court erred in granting summary judgment for the patients and in enjoining the review process. We vacate the permanent injunctions requiring the Department to approve the skilled-nursing hours prescribed by the patients' treating physicians.

### B. The Practice of Reducing Skilled-Nursing Hours After a Caregiver Learns Skilled Tasks Satisfies the Medicaid Act.

The Commissioner argues that the district court erred when it granted summary judgment for the patients on their challenge to the practice of reducing a patient's skilled-nursing hours after the patient's caregiver learns to perform skilled tasks and permanently enjoined that practice. He argues that the Department may account for a patient's stability or a caregiver's training when it

assesses what number of skilled-nursing hours is medically necessary for a patient. The patients respond that the Department cannot substitute the skilled-nursing services to which they are entitled under the Act with care that they receive from their caregivers at home. We agree with the Commissioner.

There is no genuine issue of material fact about whether the Department approves fewer hours for patients with trained caregivers. The parties agree that the Department reduces a patient's skilled-nursing hours after the patient's caregiver learns skilled tasks. Because there is no factual dispute about the practice, the question is whether the practice violates the Act.

Although the Department must provide skilled-nursing services that are reasonable to correct or ameliorate a patient's condition, *see id.* at 1255, it may draw rational distinctions between patients if the distinctions do not discriminate based on specific medical conditions, *see Curtis v. Taylor*, 625 F.2d 645, 652 (5th Cir. 1980). It is unlawful to deny medical treatment "to individuals solely on the basis of the diagnosis, type of illness, or condition." *Id.* (internal quotation marks omitted). But a determination that some patients, whatever their specific conditions, have greater medical necessity than others is permissible. *Id.*

In *Curtis*, for example, our predecessor circuit held that Florida's refusal to pay for more than three visits to a physician a month, except for emergencies, was lawful because it was rational to decide that patients who require emergency care have a higher degree of medical necessity than those who need only outpatient

treatment. *Id.* Florida reasonably gave priority to the "existence of an exigent need" by covering additional visits only for patients who need emergency care. *Id.*

The Department has drawn a rational distinction between patients who require additional skilled-nursing hours to improve their condition and those who do not. Its policy does not turn on a patient's condition. The Department gives priority to patients who lack trained caregivers over patients with trained caregivers in terms of the number of skilled-nursing hours they receive. Although it might be preferable for any patient to receive additional care from a professional nurse, it is rational for the Department to conclude that a patient without a skilled caregiver needs more professional assistance than a patient who has a skilled caregiver. Indeed, states must "provide such methods and procedures relating to" the use of Medicaid services "as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). So the Act requires the Department to consider factors, such as skilled caregivers, that bear on the efficient use of resources. If after considering those factors the Department fails to approve a reasonable number of skilled-nursing hours, individual "Medicaid recipients have recourse in the courts." *Moore*, 637 F.3d at 1259.

The patients' argument that they should receive more skilled-nursing hours because a professional nurse must provide the service is circular. Implementing regulations define "[p]rivate

duty nursing services" as nursing services provided by "a registered nurse or a licensed practical nurse" and performed "[u]nder the direction of the beneficiary's physician." 42 C.F.R. § 440.80. The patients argue that the Department's policy unlawfully denies them the private nursing services to which they are entitled under the Act and substitutes those services with skilled tasks performed by their caregivers. But the question is whether the patients reasonably require those services to correct or ameliorate their conditions. If the skills of a patient's caregiver can improve a patient's condition, it is reasonable to refuse to approve additional hours of skilled-nursing services even though those services would also improve the patient's condition. Because the Department's practice is reasonable, the district court erred by granting summary judgment for the patients and by enjoining that practice. We vacate the permanent injunctions against reducing skilled-nursing hours after the patients' caregivers learn skilled tasks.

### C. We Lack Jurisdiction over the Patient's Challenge to the Alleged Failure to Consider Caregiver Capacity.

We lack jurisdiction to review the patients' challenge to the Department's alleged failure to consider caregiver capacity. The Commissioner asks that we address this challenge because the district court previewed its views on the merits. But the district court ruled that this issue was moot in the light of its ruling that the practice of reducing skilled-nursing hours for patients with trained caregivers violated the Medicaid Act. Our pendent jurisdiction extends only to those otherwise nonappealable issues that we need to review to ensure meaningful review of the permanent injunctions.

*See Smith*, 834 F.3d at 1292. Because the district court did not grant summary judgment for the patients on this claim, this claim is not the basis for the permanent injunctions, and we lack jurisdiction to review it.

### D.  *The Appeal of the Preliminary Injunctions is Moot.*

The Commissioner asks that we review the preliminary injunctions if we vacate the permanent injunctions. But the appeal of that issue is now moot. The entry of a permanent injunction "merges" any preliminary injunction with it, and an "appeal may be had only from the order of permanent injunction." *Associated Builders & Contractors Fla. E. Coast Chapter v. Miami-Dade County*, 594 F.3d 1321, 1323–24 (11th Cir. 2010). When the district court entered the permanent injunctions, the preliminary injunctions ceased being effective. *See SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 433 (5th Cir. Unit A 1981). And our vacatur of the permanent injunctions renders the appeal of the preliminary injunctions moot. *See In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1245 (11th Cir. 2020).

### IV. CONCLUSION

We **REVERSE** the summary judgments in favor of the patients, **VACATE** the permanent injunctions against the Commissioner, and **REMAND** for further proceedings.